

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-21-2009

# USA v. Keiya Mershon

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-1351

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Keiya Mershon" (2009). *2009 Decisions*. Paper 1512.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1512

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-1351

UNITED STATES OF AMERICA

v.

KEIYA MERSHON,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 06-cr-00329)
District Judge: Honorable William H. Yohn, Jr.

Submitted Under Third Circuit LAR 34.1(a)
April 17, 2009

Before: McKEE, SMITH, and VAN ANTWERPEN, Circuit Judges

(Opinion filed    April 21, 2009 )

OPINION

VAN ANTWERPEN, Circuit Judge

On June 29, 2006, a grand jury in the Eastern District of Pennsylvania returned an

indictment of Appellant Keiya Mershon and his father, Lawrence Mershon, charging

them with one count of conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a) (a Hobbs Act offense), and one count of attempted carjacking, in violation of 18 U.S.C. § 2119. While Lawrence Mershon pleaded guilty and agreed to testify at trial, Keiya Mershon elected to proceed to trial. On April 5, 2007, a jury found Mershon guilty of both charges. On January 29, 2008, the District Court sentenced Mershon to ninety months' imprisonment, three years of supervised release, a special assessment of $200, and a fine of $1000. Mershon filed a timely notice of appeal. On appeal, Mershon raises one issue—whether the District Court erred in applying a two-level Sentencing Guidelines enhancement under U.S.S.G. § 2B3.1(b)(7)(C) based on its determination that a loss from $50,000 to $250,000 would have resulted had Mershon completed the robbery as planned.

The District Court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). For the reasons below, we will affirm Mershon's sentence.

I.

Because we write solely for the parties, we will address only those facts necessary to our opinion.

Keiya Mershon and his father, codefendant Lawrence Mershon, planned to steal a tractor-trailer loaded with appliances in Bucks County, Pennsylvania. The targeted tractor-trailer was scheduled to be delivered to Spirit Delivery in Bucks County; from there, Spirit Delivery would distribute the goods to Circuit City stores in the region. For a

2

three-month stint in 2003, Keiya Mershon worked as a contract employee at Spirit Delivery until he was fired; during that period, Mershon gained some familiarity with the company's clients, its delivery schedules, and the contents of its deliveries.

Keiya Mershon planned to hijack a tractor-trailer loaded with televisions and other electronics for delivery to Circuit City stores; he enlisted the aid of his father to drive the vehicle to a location where Mershon would sell the tractor-trailer's contents. They planned to commit the robbery early in the morning on Friday, June 9, 2006. The FBI learned through an informant that Mershon was looking for a purchaser for the contents of the stolen tractor-trailer and arranged for Special Agent Albert Channell to pose as a "fence" interested in making the purchase. On June 8, 2006, Mershon met with Al Channell, an undercover FBI agent posing as someone who could "fence" stolen goods; this meeting was recorded. During their conversation, Mershon told Channell that he expected to steal a fifty-six-foot tractor-trailer containing "at least 125 pieces" of equipment, consisting mostly of flat-screen televisions along with other electronics, and represented that "[o]ver 50% of the stuff is going to be worth a stack[1] at least on the street." Mershon offered to sell the truckload of electronics to Channell for $50,000, claiming that the value of the merchandise would be even more, and Channell agreed without attempting to negotiate a lower price.

On the morning of June 9, 2006, FBI surveillance agents followed Mershon as he drove toward the warehouse area where the robbery was to occur; Mershon drove past the

---

[1] A "stack" is the street term for $1000. *App.* at 135.

3

area without stopping. He subsequently informed Channell that, upon seeing a number of people in the warehouse area, he grew concerned about police activity and decided to abort the attempt. He further informed Channell that he would attempt the robbery the following week; in telephone calls on June 14 and June 15, 2006, Mershon confirmed that he planned to commit the robbery on June 16, 2006.

On the morning of June 16, 2006, Keiya Mershon picked up his father, Lawrence Mershon, and they drove to the warehouse where the robbery was to take place. Upon their arrival, FBI agents apprehended and arrested Keiya and Lawrence Mershon while they were still in the van and recovered a pair of black gloves from each man as well as a roll of duct tape and a claw hammer wrapped in a sock.

The Presentence Report calculated the base offense level for the robbery charge under the federal Sentencing Guidelines as 20 pursuant to U.S.S.G. § 2B3.1. Further, the probation department applied several adjustments to this base offense level: three levels were added for possessing a dangerous weapon, the hammer found in the minivan, pursuant to § 2B3.1(b)(2)(E); two levels were added under § 2B3.1(b)(5) because the offense involved an attempted carjacking; two more levels were added under § 2B3.1(b)(7)(C) because the intended loss was greater than $50,000 and less than $250,000. The District Court adopted these recommendations and, although the Presentence Report did not include any adjustment for Mershon's role in the offense, found that a two-level enhancement for his supervisory role applied pursuant to § 3B1.1(c). Accordingly, the District Court found the total offense level to be 29. Based on

4

a criminal history category of II, the corresponding Sentencing Guidelines range was 97 to 121 months.

Among other things, Mershon contested the Probation Office's assessment of "intended loss" at sentencing, arguing that it should be less than $50,000.[2] No evidence was presented as to the value of merchandise on any tractor-trailer present at the warehouse in Bucks County on June 16, 2006. The District Court reviewed the evidence and heard the parties' arguments on the issue before overruling Mershon's objection. The District Court found that Mershon's statements sufficed to demonstrate the amount of loss that would have resulted:

> [I]t seems to me that the evidence before me is quite clear that the defendant did, in fact, state that he used to work for the trucking company, Spirit, so he had knowledge of what would be in the truck on that particular Friday morning when Circuit City would be loading up for their weekend sales.
> That he himself said there were one hundred and twenty-five TVs plus additional stereo equipment in the truck, that at least fifty percent of the TVs would be worth a thousand dollars, and that would be sixty thousand [sic], five hundred plus the other sixty-two TVs, plus the stereo equipment, and that there is speculation from the defendant that perhaps there could have been less in that particular truck, but that is as has been mentioned, just speculation.
> He had already reached an agreement with the fence that the fence would pay him fifty thousand dollars for the truckload, which obviously would not be full value since the fence was going to sell them [sic] at a very substantial discount from what you could buy at the store, otherwise nobody would by them [sic] from the fence.
> So, it seems quite clear, and I find by a reasonable certainty that the intended loss in this case was in excess of fifty thousand dollars and,

---

[2] Mershon also objected to the enhancements for possession of a deadly weapon and for his supervisory role. He further argued for a three-level reduction under U.S.S.G. § 2X1.1(b)(1) and (2) because the attempt and conspiracy, respectively, were never close to completion. Mershon does not renew these arguments on appeal.

therefore, the objection to the presentence report in regard to the loss amount is denied.

*App.* at 10-11. Accordingly, the District Court found the total offense level to be 29. Based on that total offense level and a criminal history category of II, the corresponding Sentencing Guidelines range was 97 to 121 months. The District Court considered this Guidelines range as well as the factors enumerated in 18 U.S.C. § 3553(a) and imposed a sentence of 90 months' imprisonment, three years of supervised release, a fine of $1000, and a $200 special assessment. Without the two-level enhancement for the amount of intended loss, the applicable Guidelines range would have been 78 to 97 months.

## II.

We exercise plenary review of the District Court's interpretation of the federal Sentencing Guidelines and review its factual determinations for clear error. *United States v. Aquino*, 555 F.3d 124, 127 (3d Cir. 2009). A District Court's determination of intended loss is a finding of fact. *United States v. Himler*, 355 F.3d 735, 740 (3d Cir. 2004); *United States v. Geevers*, 226 F.3d 186, 193 (3d Cir. 2000). "A finding is clearly erroneous when[,] although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2006) (en banc) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)) (internal quotation marks omitted) (alteration in original).

## III.

The District Court applied a two-level enhancement pursuant to the U.S. Sentencing Guidelines Manual § 2B3.1(b)(7)(c) based on its determination that a loss of $50,000 to $250,000 would have resulted had the intended robbery been completed; Mershon claims that this enhancement stemming from his Hobbs Act robbery conspiracy conviction was error because the assessment of the intended loss as exceeding $50,000 was supported only by speculation.

Under the Hobbs Act, a conspiracy to commit robbery is a federal crime when the robbery would "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). Section 2X1.1 of the U.S. Sentencing Guidelines Manual covers attempts, conspiracies, and solicitations unless that "attempt, solicitation, or conspiracy is expressly covered by another offense guideline section." Conspiracy to commit Hobbs Act robbery and attempted carjacking are not expressly covered in U.S.S.G. § 2B3.1, the specific offense guideline for robbery, extortion, and blackmail. Accordingly, the charges against Mershon for conspiracy to commit Hobbs Act robbery and attempted carjacking are covered by U.S.S.G. § 2X1.1. *See United States v. Amato*, 46 F.3d 1255, 1261 (2d Cir. 1995) (concluding that Hobbs Act conspiracies "are covered by the conspiracy guideline, § 2X1.1"); *see also United States v. Joost*, No. 95-2031, 94 F.3d 640, 1996 WL 480215, at *12 (1st Cir. 1996) (unpublished decision) (agreeing with *Amato*'s conclusion that § 2X1.1 applied to Hobbs Act conspiracy); *Scibetta v. United States*, 32 F. Supp. 2d 711, 719 (D.N.J. 1998) ("A review of the case law thus demonstrates that in the years since *Amato* was decided there has been no

7

dispute that a robbery conspiracy under the Hobbs Act is to be sentenced under Guideline Section 2X1.1."); *cf. United States v. Martinez*, 342 F.3d 1203, 1205-06 (10th Cir. 2003) (providing that § 2X1.1 applies to attempted bank robbery); *United States v. Diaz*, 248 F.3d 1065, 1109 n.62 (11th Cir. 2001) (determining that § 2X1.1 applied for attempted theft).

Section 2X1.1(a) provides for the calculation of "[t]he base offense level from the guidelines for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Thus, when applied to a conspiracy to commit Hobbs Act robbery, U.S.S.G. § 2X1.1 incorporates by reference the adjustments set forth in U.S.S.G. § 2B3.1. *See Amato*, 46 F.3d at 1261 ("Section 2X1.1(a), when applied to robbery conspiracies, adopts by cross-reference all the adjustments of § 2B3.1, even where the offense conduct causing the adjustment was intended but unachieved."). One such adjustment to the sentence of a defendant convicted of a conspiracy to commit Hobbs Act robbery is an adjustment for the intended loss, or the loss that would have occurred had the planned robbery been completed. *See* U.S.S.G. § 2B3.1(b)(7) (setting forth table detailing offense level adjustments based on amount of loss occasioned by offense).

Thus, the sentencing court properly adjusts the base offense level in accordance with the value of the money or goods that the defendant convicted of Hobbs Act robbery conspiracy intended to steal if that value "can be established with reasonable certainty." U.S.S.G. § 2X1.1(a). The Government bears the burden of proving the amount of loss that

8

triggers a particular offense-level increase. *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008) (citing *United States v. Napier*, 273 F.3d 276, 279 (3d Cir. 2001)); *see also United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989) ("[W]hen the Government attempts to upwardly adjust the sentence, it must bear the burden of persuasion."). "Although the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." *Jimenez*, 513 F.3d at 86 (citing *Geevers*, 226 F.3d at 193). The commentary to the Guidelines makes clear that, if the Government seeks to adjust the sentence based on the intended loss, it must establish something more than a speculative assessment of the intended loss:

> Speculative specific offense characteristics will not be applied. For example, if two defendants are arrested during the conspiratorial stage of planning an armed bank robbery, the offense level ordinarily would not include aggravating factors regarding possible injury to others, hostage taking, discharge of a weapon, or obtaining a large sum of money, because such factors would be speculative.

U.S.S.G. § 2X1.1 cmt. 2. If the Government can do more than speculate about intended loss, however, the commentary provides that, "[i]n an attempted theft, the value of the items that the defendant attempted to steal would be considered." *Id.*

In its consideration of the intended loss, the District Court found "by a reasonable certainty that the intended loss in this case was in excess of fifty thousand dollars." *App.* at 142. In reaching this conclusion, the District Court observed that Mershon had

9

previously worked for Spirit Deliveries and, as a result, "he had knowledge of what would be in the truck"; that Mershon estimated that the tractor-trailer would contain 125 televisions plus additional stereo equipment; that Mershon assessed the value of fifty percent of those televisions as $1000 each; and that Mershon had reached an agreement to sell the contents of the tractor-trailer for $50,000, "which obviously would not be full value since the fence was going to sell them at a very substantial discount." *Id.* at 141-42.

This Court previously has considered the meaning of "intended loss." *Geevers*, 226 F.3d at 188-92 (evaluating District Court's assessment of intended loss in check-kiting scheme); *see also, e.g.*, *United States v. Kushner*, 305 F.3d 194, 197 (3d Cir. 2002) (considering whether District Court erred in calculating intended loss of conspiracy by including face value of unused counterfeit checks where defendant withdrew from conspiracy before using those checks); *United States v. Titchell*, 261 F.3d 348, 352-53 (3d Cir. 2001) (determining that District Court's calculation of intended loss from mail fraud scheme was error where District Court equated potential loss with intended loss without "deeper analysis"). In *United States v. Geevers*, this Court considered the appeal of a defendant who had pleaded guilty to bank fraud via a check-kiting[3] scheme in which he would deposit checks from closed bank accounts or accounts with insufficient funds and then withdraw a portion of the money before the banks could learn of the fraud. 226 F.3d

---

[3] Check kiting is the "'[p]ractice of writing a check against a bank account where funds are insufficient to cover it and hoping that before it is deposited the necessary funds will have been deposited.'" *Geevers*, 226 F.3d at 189 n.2 (quoting Black's Law Dictionary 238 (6th ed. 1990)).

at 188. Geevers argued that the District Court erred by enhancing his sentence based on the intended loss of $2,000,000; while that amount corresponded to the approximate face value amount of the deposited checks, Geevers asserted that it overstated the intended loss, because he never could have withdrawn the full face value of the deposited checks. *Id.* at 188-89.

The *Geevers* Court observed that "a district court errs when it simply equates potential loss with intended loss without deeper analysis." *Id.* at 192. Although this Court did not make clear what such a "deeper analysis" would entail, it noted that "'[i]ntended loss refers to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims.'" *Id.* (quoting *United States v. Yeaman*, 194 F.3d 442, 460 (3d Cir. 1999)); *cf. United States v. Chapdelaine*, 989 F.3d 28, 35 (1st Cir. 1993) ("The requirement of 'reasonable certainty' 'goes to what with reasonable certainty can be determined to be the conspirator's intent.'" (quoting *United States v. Medeiros*, 897 F.2d 13, 18 (1st Cir. 1990)). In determining the defendant's subjective intent, the District Court "can draw inferences from the nature of the crime he sought to perpetrate." *Id.* Ultimately, this Court held that the District Court could infer that Geevers intended to cause the full loss of the face value of the checks. *Id.* at 193. It noted that even if the defendant did not expect to be able to obtain the full face value of the fraudulent checks, "[w]e believe that a sentencing court may plausibly conclude that a defendant like Geevers would likely have taken the full amount of the deposited checks if that were possible." *Id.*

11

Although the amount of the potential loss that could have resulted had Mershon completed the robbery is unknown,[4] this Court's focus on the defendant's subjective intent in *Geevers* is instructive. An inquiry into Mershon's subjective intent demonstrates that the District Court did not commit clear error in applying a two-level enhancement pursuant to the U.S.S.G. § 2B3.1(b)(7)(c) based on its determination that a loss of $50,000 to $250,000 would have resulted had Mershon succeeded in his intended robbery.

First, Mershon was not "arrested during the conspiratorial stage of planning [the] robbery"; he was arrested after the planning phase and just before executing the plan. *Cf.* U.S.S.G. § 2X1.1 cmt. 2. Further, the Government satisfied its burden as to the amount of the "intended loss." The Government provided evidence that Merson was familiar with Spirit Deliveries shipping practices. When he met with Special Agent Channell, who

---

[4] In *Geevers*, this Court referred to potential loss and cautioned district courts against automatically equating potential loss with intended loss. That focus is inapposite in this case. In *Geevers*, the potential loss was easily ascertained based on the face value of the deposited checks; indeed, the potential loss was not only ascertainable but was also "entirely under [the defendant's] control" when he wrote out the checks. *Geevers*, 226 F.3d at 188-89, 194. Here, however, the potential loss from Mershon's intended hijacking and robbery of the tractor-trailer is unknown and outside of Mershon's control. Although the Government's brief, by arguing that "the intended loss and the potential loss are the same," focuses on the relationship between the potential loss and the intended loss, this emphasis is misplaced, because the record does not contain evidence that would establish the potential loss. *Appellee's Br.* at 19. The Government did not introduce any evidence as to the value of merchandise in any of the trailers at the warehouse on the day of the robbery. Indeed, although Mershon told the "fence" to whom he planned to sell the tractor-trailer's contents that the truck would carry 125 pieces of equipment, the record shows that a tractor-trailer at Spirit Deliveries on June 8, 2006, the day before Mershon initially planned to execute the robbery, contained just forty-three televisions. *App.* at 72, 95-100.

recorded the conversation and posed as a fence interested in purchasing the contents of the tractor-trailer to be stolen, Mershon indicated that he estimated the value of the truck's contents based on his experience working for Spirit Deliveries:

Channell:    . . . Now when we get there how do you know what's gonna be in the truck?
Mershon:    . . . I used to work there. So, I mean, I got a idea.
Channell:    And it's always been pretty much the same thing?
Mershon:    Yeah.
Channell:    All right.
Mershon:    The whole truck, when they's bringing in deliveries on Friday, it would be for like Friday, Saturday and Sunday.

*App.* at 88. Although Mershon worked for Spirit Deliveries for only three months during 2003, he apparently was sufficiently familiar with its shipping business to know that it delivered shipments of electronic equipment to Circuit City stores and that the most valuable of these shipments occurred on Fridays, because those shipments contained merchandise for weekend sales.

With respect to Mershon's subjective assessment of the loss that would have resulted from the robbery, the Government provided evidence that he negotiated with Channell to sell the contents of the stolen tractor-trailer for $50,000[5] based on his estimate

_____

[5] On appeal, Mershon asserts that his proposed $50,000 price for the contents of the trailer represents an unreliable basis to assess the intended loss. Specifically, he contends that the offer was just an opening price and, because the fence never attempted to negotiate, it overstated the value of the trailer's contents. Nevertheless, when he met with Channell, Mershon thought he was meeting with a true fence; as a result, he had an incentive to set a reasonable price to ensure that the fence accepted it. Further, in his negotiation with the fence, Mershon estimated that half of the 125 pieces in the trailer would be worth $1000 each on the street. Based on that estimation, just half of the contents would be worth $62,500.

that the trailer would contain 125 pieces of equipment, at least fifty percent of which would be worth $1000 on the street. Under Mershon's assessment, the street value of just half of the trailer's contents would be $62,500; the remaining half of the equipment would surely add to this amount. Further, as the District Court noted, this street value likely reflected some discount from the full retail value of the merchandise, as purchasers of stolen goods demand a discounted price.

Based on Mershon's brief experience working at Spirit Deliveries, he had enough familiarity with its shipping practices to estimate the amount of merchandise that a tractor-trailer would carry. His estimation of the nature and value of the contents of a tractor-trailer amounted to more than mere hope or speculation. *Cf. United States v. Capanelli*, 270 F. Supp. 2d 467 (S.D.N.Y. 2003) (declining to enhance sentence of defendant convicted of conspiracy to rob credit union based on intended loss pursuant to U.S.S.G. § 2B3.1(b)(7) where Government established "no more than hopes and uninformed beliefs" that defendant "intended to steal over $1.5 million); *United States v. Vasquez*, 791 F. Supp. 348, 249, 353 (E.D.N.Y. 1992) (declining to enhance sentence for defendant convicted of conspiring to rob armored van based on intended loss where defendants merely "hoped" they could steal $5 million). *See also United States v. Chapdelaine*, 989 F.3d 28 (1st Cir. 1993) (affirming sentence enhancement for defendant convicted of conspiring to rob an armored truck based on intended loss of $1,000,000 where targeted armored truck was recovered with approximately $1,000,000).

Doubt exists as to the accuracy of Mershon's assessment, because the Government

failed to provide evidence as to the actual value of the contents of any tractor-trailer at the warehouse on June 16, 2006, and because the record shows that another tractor-trailer, scheduled to make deliveries on the day that Mershon initially planned to commit the robbery, contained just forty-three televisions. Nevertheless, the Government demonstrated that Mershon's assessment was more than mere speculation; rather, it was based on his familiarity with Spirit Deliveries' shipping practices. Further, the Government presented evidence of Mershon's subjective expectations as to the value of the contents of a tractor-trailer, and Mershon failed to counter that evidence with evidence demonstrating that his subjective expectation of the proceeds from the robbery was less than $50,000. Accordingly, the District Court did not commit clear error in concluding that the intended loss from the conspiracy exceeded $50,000.

Based on the foregoing, we will affirm Mershon's sentence.