United States Court of Appeals,

Eleventh Circuit.

No. 96-3225.

UNITED STATES of America, Plaintiff-Appellee,

v.

Nancy TATUM, a.k.a. Nancy Fullilove, Gene Tatum, a.k.a. Dois Gene Tatum, a.k.a. Chip Tatum, Defendants-Appellants.

April 13, 1998.

Appeals from the United States District Court for the Middle District of Florida. (No. 96-72-CR-T25A), Henry Lee Adams, Jr., Judge.

Before ANDERSON and MARCUS, Circuit Judges, and HANCOCK[*], Senior District Judge.

PER CURIAM:

After a jury trial, appellants Gene and Nancy Tatum, were convicted of conspiracy in violation of 18 U.S.C. § 371. The conspiracy had two objects: (1) making a false statement for the purpose of influencing the Federal Deposit Insurance Corporation ("FDIC") in violation of 18 U.S.C. § 1007; and (2) defrauding and embezzling money from the FDIC in violation of 18 U.S.C. § 641. Both defendants were also convicted of the substantive violation of section 1007.

Because of a bank failure, the FDIC in 1989 became the receiver for the Ironwood Golf Course and Villas ("Ironwood"). In 1991, the FDIC entered into a property management contract for the management of the Ironwood properties. Gene Tatum was the on-site property manager, and in that capacity he signed a one-page attachment to the property management contract representing to the FDIC that he was "hereby disclos[ing] any and all parties that are directly or indirectly related

---

[*]Honorable James H. Hancock, Senior U.S. District Court Judge for the Northern District of Alabama, sitting by designation.

... who are to receive payments for any proposed goods or services related to the management of the Property." As the on-site property manager, Gene Tatum had the ultimate management responsibility for the property.

At the time he signed the property management agreement, Gene Tatum had set up and become a principal in a company called Tee Time Management, Inc. ("Tee-Time"). The plan was to subcontract with Tee-Time for performance of the work maintaining Ironwood's greens, fairways, swimming pool, etc. Gene Tatum and his co-conspirators thought that Tee-Time would be an extra source of income for them. Although Tee-Time was clearly a related party, Gene Tatum did not disclose his arrangement with Tee-Time when he signed the above-mentioned form. Rather, his relationship to Tee-Time was concealed. Nancy Tatum, then known as Nancy Fullilove, was Gene Tatum's girlfriend at the time of the criminal conspiracy. She worked at Ironwood. She assisted Gene Tatum in the foregoing criminal conspiracy, including depositing checks intended for the FDIC into unauthorized bank accounts.

In this appeal, appellants challenge both their convictions and their sentences. Their challenges to their convictions are without merit.[1] We address the challenge to their sentences.

Both appellants challenge the amount of the loss used by the district court in its calculation of the total offense level. With respect to Gene Tatum, the district court calculated an eight-level increase on account of $75,837.78 of losses caused by Gene Tatum's crimes. With respect to Nancy

---

[1] We reject appellants' argument that there was no false statement as contemplated by 18 U.S.C. § 1007. On the particular facts of this case, we readily conclude that Gene Tatum made an affirmative statement that he was disclosing all related parties who were to receive payments. He did not do so, and therefore his statement was false. Appellants' other arguments challenging their convictions are without merit and warrant no discussion.

Tatum, the district court calculated a six-level increase on account of $39,944.00 of losses involved in Nancy Tatum's participation in the crimes.

Although it is not entirely clear from the sentencing transcripts, the loss amounts used by the district court apparently represented the gross amount of funds with respect to which each defendant was a participant. For example, the $78,000 figure apparently consisted of the gross amount of monies paid by the FDIC to Tee-Time plus the gross amounts of monies paid by golfing patrons which Gene Tatum diverted to bank accounts under his control (rather than depositing same to the bank accounts under the FDIC supervision or control as required by the management contract). With respect to Nancy Tatum, the $39,000 figure apparently represented the gross amounts that were deposited into her personal account (rather than the accounts supervised or controlled by the FDIC as required by the contract). These gross amounts apparently were not reduced by the services actually performed by Tee-Time on the Ironwood properties, or to the extent that some or all of the dollars diverted to inappropriate bank accounts were actually used for legitimate Ironwood expenses.

Appellants argue that the district court's use of such gross amounts as the loss figure was error. They argue that the evidence established no loss at all suffered by the FDIC. They also argue that there was no intended loss. Although conceding that the contracts with Gene Tatum and Tee-Time were procured by fraud (because Gene Tatum failed to disclose the relationship), appellants argue that Tee-Time actually performed the services in maintaining the greens, fairways, etc., and thus the FDIC suffered no loss. They argue that there was no intended loss, because appellants intended all along to perform the required services.

The appropriate treatment of victim losses in the total offense level calculation will vary with the nature of the offense. For example, in the case of a simple theft, United States Sentencing

Guidelines Manual ("U.S.S.G."), § 2B1.1 provides that " "[l]oss' means the value of the property taken, damaged, or destroyed." The theft guideline, U.S.S.G. § 2B1.1, Application Note 2, indicates that the theft "loss" is not affected by recovery of any portion of the stolen property. In the district court, the government took the position that the foregoing was the applicable standard, and apparently, the district court acceded to the government's position and used the gross amounts as above described.

However, this case does not involve a simple theft. Rather, this case has been litigated upon the assumption[2] by all of the parties (and the district court) that the crimes involved were not simple theft, but rather were in the nature of the fraudulent procurement of a contract.[3] As pointed out by the Third Circuit in *United States v. Kopp,* 951 F.2d 521 (3rd Cir.1991), and by the Seventh Circuit in *United States v. Schneider,* 930 F.2d 555 (7th Cir.1991), the analysis in a case of fraud is not as simple as in a case of simple theft. In a simple theft, there is almost always an intent to deprive the victim of the value of the property taken. Thus, it is appropriate to allow no reduction for the recovery of any portion of the stolen property. In some cases of fraud, there will be a similar intent to deprive the victim of the full amount fraudulently taken. However, in other cases of fraud, the perpetrator may intend no loss. Appellants argue that their crimes fall in the latter category.

---

[2]For this reason, we treat the case as one involving solely the fraudulent procurement of a contract. Thus, we need not decide whether a different treatment would be appropriate in a case in which the fraud was in the nature of embezzlement.

[3]In other words, Gene Tatum fraudulently obtained the contract by failing to disclose his relationship to subcontractor Tee-Time.

We conclude that the U.S. Sentencing Guidelines do stake out a treatment of "loss" for cases of fraudulent procurement of a contract which is different from that for simple theft. U.S.S.G. § 2F1.1, Application Note 7, provides in relevant part:

> 7. Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred. Consistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

> There are, however, instances where additional factors are to be considered in determining the loss or intended loss:

> ...

(b) *Fraudulent Loan Application and Contract Procurement Cases*

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

> In some cases, the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct. For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct. Conversely, a defendant may understate his debts to a limited degree to obtain a loan (*e.g.,* to expand a grain export business), which he genuinely expected to repay and for which he would have qualified at a higher interest rate had he made truthful disclosure, but he is unable to repay the loan because of some unforeseen event (*e.g.,* an embargo imposed on grain exports) which would have caused a default in any event. In such a case, the loss determined above may overstate the seriousness of the defendant's conduct. Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted.

5

U.S.S.G. § 2F1.1, Application Note 7. We conclude that the above-quoted guideline is applicable to this case, and that the district court erred in failing to apply it. Therefore, we must vacate appellants' sentences and remand for resentencing. If on remand the district court finds that there is no actual loss and no intended loss, then there should be no enhancement of the base offense level on account of the amount of the losses, unless of course an upward departure is found appropriate. *See id.* ("In some cases, the loss determined above may significantly understate ... the seriousness of the defendant's conduct. For example, ... the loss determined ... [may] tend not to reflect adequately the risk of loss," and thus "an upward ... departure may be warranted.").

For the foregoing reasons, the convictions of appellants are AFFIRMED, but the sentences are VACATED, and the case is REMANDED for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.