**UNITED STATES of America, Plaintiff–
Appellant, Cross–Appellee,**

v.

**John D. LAUER, Defendant–Appellee,
Cross–Appellant.**

Nos. 97–3593, 97–3693.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1998.

Decided June 24, 1998.

Edward G. Kohler (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellant.

Susan Getzendanner, Donna L. McDevitt (argued), Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL, for Defendants–Appellants.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

The defendant pleaded guilty to mail fraud and related offenses and was sentenced to 38 months in prison. Both sides appeal. The government claims that the judge should have raised Lauer's offense level by four levels because he defrauded a financial institution; Lauer claims that the judge should have found that the loss from the fraud did not exceed $20 million and should therefore have set the offense level one level down. We take up the defendant's appeal first.

Lauer was the employee benefits manager of the Chicago Housing Authority. In this position he administered the CHA's employee pension fund. He fell in with some con men who ran a Ponzi scheme. See *SEC v. Lauer,* 52 F.3d 667 (7th Cir.1995). He diverted some $15 million in pension fund moneys—almost half the total fund—to the con and induced other persons to invest additional money in it. A total of $19.9 million was lost, of which $4 million ended up in his pocket. Had the scheme not been discovered when it was, an additional $5 million, at least, might have been lost.

■ The federal sentencing guidelines vary the sentencing range for fraud depending on the amount of loss. U.S.S.G. § 2F1.1(b). Loss is defined as either the actual or the intended loss—whichever is greater. § 2F1.1, Application Note 7; *United States v. Saunders,* 129 F.3d 925, 930 (7th Cir.1997); *United States v. Coffman,* 94 F.3d 330, 336 (7th Cir.1996); *United States v. Bald,* 132 F.3d 1414, 1416 (11th Cir.1998) (per curiam). The judge hoisted Lauer over the $20 million threshold by adding the $19.9 million in actual loss to the $5 million in additional intended but unrealized loss, and the government says that this is all right because the $19.9 million was intended too and so the total intended loss was $24.9 million. The briefs of the parties tacitly assume that the guidelines do not permit adding an actual to an intended loss—though the guidelines and their voluminous commentary do not address the issue, there are no reported decisions addressing it, and the assumption is unwarranted in some cases. In some it is warranted. If the defendant intended to steal $5 million and succeeded in stealing $1 million, it would be absurd to reckon the loss at $6 million, for this would result in his being punished more severely than if his theft had been a complete success. But here we have multiple victims, and we cannot think of any objection to adding the actual loss of one to the intended loss of another, any more than it would be objectionable to punish the defendant separately for murdering X and attempting to murder Y, as distinct from punishing him separately for murdering and attempting to murder X.

■ Even if actual and intended losses could not be added in a case such as this, Lauer's appeal would fail. He says he didn't intend the loss of the entire $19.9 million, and there is a sense in which this is true. But it is the same sense in which the author of a Ponzi scheme might not intend that any of his investors lose anything—might intend that the scheme continue until the end of the world, in which event there would be no losers. Likewise an embezzler might not intend to impose a loss on his employer, might instead intend to use the money to gamble and win and thus be able to replace every penny he had taken. Suppose that he is caught before he has a chance to gamble

with any of the money, and every cent is recovered. He is nevertheless an embezzler to the full extent of the amount he took, no matter how golden his intentions or happy the consequences. *United States v. Holiusa,* 13 F.3d 1043, 1046 (7th Cir.1994); *United States v. Mount,* 966 F.2d 262, 266 (7th Cir. 1992); see also *United States v. Dial,* 757 F.2d 163, 170 (7th Cir.1985); cf. *United States v. Schneider,* 930 F.2d 555, 558 (7th Cir.1991).

■ We may put it this way: the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property. That amount measures the gravity of his crime; that he may have hoped or even expected a miracle that would deliver his intended victim from harm is both impossible to verify and peripheral to the danger that the crime poses to the community. Maybe if he returns part of the money or property to the victim before the crime is detected (not after, *United States v. Saunders, supra,* 129 F.3d at 931) he should get a break in sentencing in order to encourage such behavior. The cases are divided on that question. Compare *United States v. Holiusa, supra,* 13 F.3d at 1046–47, with *United States v. Loayza,* 107 F.3d 257, 265–66 (4th Cir.1997), the latter case pointing out that such returns are a typical ingredient of Ponzi schemes—a lure rather than a sign of repentance. See *id.* at 266. The disagreement is immaterial here, because Lauer is not arguing that the amount of the loss should be reduced on the basis of money that he returned before he was caught; he may have returned some, but apparently not enough to knock the loss down below $20 million.

Focusing on the amount of money that the defendant has put at risk helps us to locate the present case in relation to cases involving the fraudulent procurement of loans and contracts. In those cases the loss is the part of the loan that the defendant does not intend to repay, or the value of the part of the contractual performance that he intends to omit, rather than the entire loan or entire contract price. U.S.S.G. § 2F1.1, Application Note 7(b); *United States v. Downs,* 123 F.3d 637, 642–43 (7th Cir.1997); *United*

*States v. Schneider, supra,* 930 F.2d at 557–59; *United States v. Tatum,* 138 F.3d 1344, 1346–47 (11th Cir.1998) (per curiam); *United States v. Sublett,* 124 F.3d 693 (5th Cir.1997); *United States v. Wolfe,* 71 F.3d 611, 617 (6th Cir.1995). Suppose a government employee misrepresents his credentials, and as a result is paid a salary of $500 a week, whereas if he had made a truthful representation he would have been paid only $400. The amount of the employer's money placed at risk (not necessarily lost, for the fraud might be discovered before the employee received his first paycheck) would be only $100, not $500, times some number of weeks that the employee expected to be employed. Lauer, however, intended to place the full $24.9 million of pension fund and investors' money at risk by shunting it to the con men. It was as if he had embezzled (or intended to embezzle) this amount and had turned it (or planned to turn it) over to a casino.

■ We turn to the government's appeal. In section 2507(a) of the Crime Control Act of 1990, Pub.L. 101–647, 104 Stat. 4789, 4862, Congress directed the Sentencing Commission to enhance the punishment for certain offenses "affecting a financial institution (as defined in section 20 of title 18, United States Code) ... if the defendant derives more than $1,000,000 in gross receipts from the offense." Section 20 defines "financial institution" to mean any of nine different types of institution, mainly banks of one sort or another, but not pension funds. Upon the passage of this Act the Sentencing Commission amended the fraud guideline to provide for enhancement if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2F1.1(b)(6)(B). The quoted language is taken from the statute and there is no definition of "financial institution" in the guideline itself. But Application Note 14 defines the term to mean not only the institutions enumerated in 18 U.S.C. § 20 but also a host of other institutions, including insurance companies, mutual funds, broker-dealers—and "union or employee pension fund[s]." About this expansion of the meaning of the term "financial institution" beyond the meaning it bears in

the Crime Control Act, the Sentencing Commission said only, in the "Background" portion of the commentary to U.S.S.G. § 2F1.1, that "subsection (b)(6)(B) implements the instruction to the Commission in Section 2507 [of the Act]."

 This won't do to build a rational bridge from the statutory definition of financial institution to pension funds. Congress did not instruct the Commission to jack up the offense level for defrauding pension funds. It instructed the Commission to jack up the offense level for a set of financial institutions that does not include pension funds by any possible stretch of the imagination. There is no way to uphold Application Note 14 as an interpretation of the statute. But that is not the end of the analysis, and this for two interrelated reasons. The first is that the Sentencing Commission has the power and the duty not only to interpret specific provisions of federal statutes regulating criminal punishment, such as section 2507 of the Crime Control Act of 1990, but also to establish, in its discretion except insofar as that discretion is cut down by statutes fixing minimum and maximum penalties, standards designed to promote uniform and rational federal sentencing. See 28 U.S.C. §§ 991(b), 994(a), (f); *Mistretta v. United States,* 488 U.S. 361, 367–70, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In the exercise of this authority, which is legislative in character rather than interpretive, *United States v. Kirvan,* 86 F.3d 309, 311 (2d Cir.1996); *United States v. Spencer,* 25 F.3d 1105, 1111 and n. 2 (D.C.Cir.1994), the Commission is free to seek guidance from any source that may contain information relevant to calibrating criminal punishment. The potential sources include federal statutes that may not rule the case at hand (if they do or may, the Commission's only tasks are interpretation and application) but may disclose considerations that can guide the Commission in carrying out its legislative function. Cf. *United States v. Rutherford,* 54 F.3d 370, 374 n. 11 (7th Cir. 1995).

Section 2507, for example, read in conjunction with 18 U.S.C. § 20, might support an inference that particular kinds of financial institution are particularly vulnerable to fraud and so require more protection than the existing sentencing guidelines provide. And it might be that whatever it was about these institutions that created this enhanced vulnerability was also a feature of union and employee pension funds. Then, treating the statute not as directing, expressly or by interpretation, enhanced punishment of people who defraud pension funds, but rather as a source of insight helpful to the Commission in the exercise of its discretionary standard-making functions with regard to offenses lying outside the scope of the statute, the Commission might prescribe enhanced punishment for such defrauding.

Yet the only explanation that the Commission gave for dramatically expanding (by *means of the application note) the meaning* of "financial institution" in the Crime Control Act is the inaccurate sentence that we quoted from the background commentary on implementing Congress's instruction—which Application Note 14 plainly does not do. If the Commission misread section 2507, overlooking the fact that the term "financial institution" in that section is limited to those institutions listed in 18 U.S.C. § 20 and so does not include pension funds, then Application Note 14 is not a statement of enforcement policy within the Commission's discretion but merely an incompetent statutory interpretation, and as such it would not provide a reasoned basis for enhancing Lauer's punishment. See *United States v. Kennedy,* 32 F.3d 876, 889 (4th Cir.1994). Obviously, congressional policy would be ill served if the Commission took the position that whenever Congress says "Punish A, B, and C as follows," the Commission responds, "Fine, we'll punish A, B, C, D, E, and F as you have just instructed us to do."

But there is (to come to our second point) more to the government's appeal—another statute. The Crime Control Act was actually Congress's *second* directive to the Sentencing Commission to punish crimes against financial institutions more heavily than the same crimes when directed at other victims. In section 961(m) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183, 501, Congress had directed the

Commission to promulgate guidelines to punish with increased severity crimes that "substantially jeopardize[ ] the safety and soundness of a *federally insured* financial institution" (emphasis added), and the Commission had done so. U.S.S.G. § 2F1.1(b)(6)(A). That was when Application Note 14 first appeared in the guidelines commentary; it defines "financial institution" in the FIRREA guideline (§ 2F1.1(b)(6)(A)) identically to the definition in the corresponding guideline under the Crime Control Act. As a gloss on the FIRREA guideline, however, the application note, with its broad definition of "financial institution," goes *far* beyond the statutory domain. FIRREA is narrowly and specifically limited to federally insured institutions; the application note is not. The Sentencing Commission could not have been under any illusion that it was "interpreting" the statute—and in fact the background commentary says that in defining "financial institution" the guideline "implements, *in a broader form,* the instruction to the Commission in Section 961(m)" of FIRREA (emphasis added). The Commission thus knew it was legislating. So when a year later, in the Crime Control Act, the Commission adopted the identical definition of financial institution, it doubtless thought that it was, as before, legislating a broader prohibition than Congress's, though it did not repeat "in a broader form" and instead used a form of words indicative of interpretation rather than legislation. Since the government sought the enhancement of Lauer's sentence under FIRREA as an alternative to the Crime Control Act (and the enhancement is the same under either statute), the question whether the guideline applicable to the Crime Control Act rests on a misreading of that Act turns out to be immaterial. The government was entitled to enhancement under the (identical) FIRREA guideline. The judgment must therefore be vacated and the case returned to the district court for resentencing in conformity with this opinion. ·

VACATED AND REMANDED, WITH DIRECTIONS.